**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------X
CHARLES EVANS,

               Plaintiff,

     -against-

UNITED STATES OF AMERICA,

              Defendant.
-------------------------------------------------X

        **MEMORANDUM OF**
        **DECISION AND ORDER**
        11-CV-1661 (ADS) (GRB)

**FILED**
**CLERK**

7/31/2013 4:47 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

<u>**APPEARANCES:**</u>

**Falk & Klebanoff, P.C.**
*Attorneys for the Plaintiff*
392 Woodfield Road
West Hempstead, New York 11552
     By:  Jeffery P. Falk, Esq.

**Loretta E. Lynch, United States Attorney**
**United States Attorney's Office**
*Attorneys for the Defendant*
610 Federal Plaza
Central Islip, New York 11722
     By:  Robert W. Schumacher, Assistant United States Attorney

**SPATT, District Judge.**

     On March 30, 2011, the Plaintiff Charles Evans (the "Plaintiff") commenced this action

against the Defendant United States of America (the "Defendant").  The Plaintiff asserts

negligence claims pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 ("the FTCA"), and

§ 5102 of New York State's No-Fault Insurance Law ("N.Y. Ins. Law" or the "No-Fault Law").

In this regard, the Plaintiff alleges that he suffered a "serious injury," as defined by N.Y. Ins.

Law § 5102(d), as the result of a motor vehicle accident with Jacob L. Tennis ("Tennis"), an

employee of the Defendant.

Presently before the Court is the Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56. Also before the Court is the Defendant's unopposed motion to strike from the summary judgment record the affidavit of the Plaintiff's chiropractor, Dr. Marie G. Gerard ("Dr. Gerard"). For the reasons set forth below, the Court denies the motion to strike, but grants the motion for summary judgment.

## I. THE DEFENDANT'S MOTION TO STRIKE DR. GERARD'S AFFIDAVIT

Before discussing the background facts of this case or addressing the Defendant's motion for summary judgment, the Court must first resolve the Defendant's motion to strike the affidavit of Dr. Marie G. Gerard. Century Pacific, Inc. v. Hilton Hotels Corp., 528 F. Supp. 2d 206, 213 (S.D.N.Y. 2007) ("Because 'a decision on the motion to strike may affect [the movant's] ability to prevail on summary judgment,' it is appropriate to consider the Motion to Strike prior to the Motion for Summary Judgment.") (quoting Century Pac., Inc. v. Hilton Hotels Corp., 528 F. Supp. 2d 206, 213 (S.D.N.Y. 2007) aff'd, 354 F. App'x 496 (2d Cir. 2009)). In this regard, on June 4, 2012, discovery in this case closed. Pursuant to this Court's Individual Rules, on June 22, 2012 and July 19, 2012, the Plaintiff and the Defendant exchanged their Fed. R. Civ. P. 56.1 Statements of Facts. Thereafter, on October 22, 2012, the Defendant moved for summary judgment.

On November 6, 2012, responding to the Defendant's motion for summary judgment, the Plaintiff requested the right to supplement the summary judgment record with Dr. Gerard's affidavit. The Defendant opposed the Plaintiff's request to so supplement the summary judgment record. On November 7, 2012, the Court directed the Defendant to address any issue pertaining to discovery and the summary judgment record to the United States Magistrate Judge assigned to this case, the Honorable Gary R. Brown.

Subsequently, on November 19, 2012, Judge Brown found the issue of whether the Plaintiff could supplement the summary judgment record with Dr. Gerard's affidavit to be premature. However, Judge Brown stated that "[s]hould, after examination, plaintiff seek to supplement the record with additional medical findings or information, it may seek relief from the undersigned at that time, at which point the Court may consider that application, along with the Government's objections, upon a full record." (Docket Entry No. 28.)

On December 7, 2012, the Plaintiff filed his response to the Defendant's motion for summary judgment and attached Dr. Gerard's affidavit. However, the Plaintiff failed to renew his application to supplement the summary judgment record pursuant to Judge Brown's November 19, 2012 Order. On December 11, 2012, the Defendant filed a letter addressed to Judge Brown moving to strike Dr. Gerard's affidavit from the summary judgment record. The Defendant's letter motion to strike is unopposed by the Plaintiff.

According to the Defendant, Dr. Gerard's affidavit should be stricken because the Plaintiff neither made the application to the Court as required by Judge Brown's November 19, 2012 Order nor provided the required expert or treating physician disclosures pursuant to Fed. R. Civ. P. 26. The Court disagrees.

As an initial matter, the Court first finds that, under the provisions of Fed. R. Civ. P. 26(a)(2), the Plaintiff was not required to disclose Dr. Gerard's affidavit. Fed. R. Civ. P. 26(a)(2) states that a party presenting an expert witness must provide a written report that discloses the expert witness to the opposing party. Under the provisions of Fed. R. Civ. P. 37 (c)(1), "if a party fails to provide information or identify a witness as required by [Fed. R. Civ. P.] 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Courts have found that failure to disclose an expert witness may prejudicially ambush the opposing party. Palma v. Pharmedica Communications, Inc., 00CV1128 (AHN), 2002 WL 32093275, at *2 (D. Conn. Mar. 27, 2002).

However, "treating physicians have consistently been held not to be experts within the meaning of Fed. R. Civ. P. 26(a)(2)." Thompkins v. Santos, No. 98Civ.4634 (MBM)(HBP), 1999 WL 1043966, at *7 n.5 (S.D.N.Y. Nov. 16, 1999); see also Zanowic v. Ashcroft, No. 97CIV.5292JGKHBP, 2002 WL 373229, at *2 (S.D.N.Y. Mar. 8, 2002) ("It is well settled that a treating physician is not subject to the disclosure obligations set forth in Fed. R. Civ. P. 26(a)(2)(B).").  With respect to determining whether a physician is a treating physician or an expert, while "[t]he law is not well developed as to what makes a physician a 'treating physician[,]' [t]he critical factor . . . appears to be why the physician was retained." Zanowic, 2002 WL 373229, at *2.

In this regard, "whether a physician is a treating or consulting physician appears to turn on why the patient saw the physician—for treatment or for testimony." Id.  Thus, if the physician examines the patient so that she may provide testimony at trial, then that physician is considered an expert witness, but if the physician examines the patient for the primary purpose of treating the patient, she is considered a treating physician. See, e.g., Mangla v. Univ. of Rochester, 168 F.R.D. 137, 139 (W.D.N.Y. 1996) ("Experts are retained for purposes of trial and their opinions are based on knowledge acquired or developed in anticipation of litigation or for trial.  A treating physician's testimony, however, is based on the physician's personal knowledge of the examination, diagnosis and treatment of a patient and not from information acquired from outside sources.").

Here, Dr. Gerard is clearly the Plaintiff's treating physician. Indeed, Dr. Gerard and the Plaintiff have had an ongoing relationship and Dr. Gerard acquired her opinion as to the cause of the Plaintiff's injuries directly through treatment of the Plaintiff. Mangla, 168 F. R. D. at 139; cf. Ebewo v. Martinez, 309 F. Supp. 2d 600, 606 (S.D.N.Y. 2004) (finding that a physician was not a treating physician where his "affidavit makes clear that he did not have an ongoing relationship" with the patient). Furthermore, Dr. Gerard was retained by the patient for treatment and was not specially employed for her testimony, as the Plaintiff had visited Dr. Gerard multiple times before this litigation began and was given treatment related to his injuries. See Zanowic, 2002 WL 373229, at *2. Therefore, the Plaintiff was not required to disclose Dr. Gerard as an expert pursuant to Fed. R. Civ. P. 26(a)(2).

Nevertheless, even if the Court was to consider Dr. Gerard as an expert, "[p]recluding testimony from the expert under [Fed. R. Civ. P. 37(c)(1)] is a drastic remedy and should only be applied in cases where the party's conduct represents flagrant bad faith and callous disregard of the federal rules." McNerny v. Archer Daniels Midland Co., 164 F.R.D. 584, 587 (W.D.N.Y. 1995) (citing Hinton v. Pantnaude, 162 F.R.D. 435, 439 (N.D.N.Y. 1995)). Here, the Court finds neither "flagrant bad faith" nor "callous disregard of the federal rules" on the part of the Plaintiff, because, as discussed in more detail below, the Defendant was made aware of the identity and relevance of Dr. Gerard during the discovery process.

The decision as to whether a court may consider documents in these circumstances "rests within the sound discretion of the district court." Lore, 2005 WL 3095506, at *3. In this case, while Dr. Gerard's affidavit was not disclosed until after the close of discovery, the Court finds that the Plaintiff's failure in this respect is harmless. In this regard, courts have held that a "failure to disclose witness information is 'harmless' if the other party was well aware of the

identity of the undisclosed witness and the scope of knowledge well before the trial."
Morgenstern v. County of Nassau, No. 04–CV–0058 (JS) (ARL), 2008 WL 4449335, at * 3
(E.D.N.Y. Sept. 29, 2008) (quoting Fleet Capital Corp. v. Yamaha Motor Corp., No. 01–CV–
1047 (AJP), 2002 WL 31174470, at *6 (S.D.N.Y. Sept. 19, 2002)).

For example, in Morgenstern, the court denied a plaintiff's motion to strike two affidavits
offered by the defendants in support of their motion for summary judgment. Although the
defendants had failed to disclose the two affiants, the Morgenstern court reasoned that this
failure was harmless because the plaintiff was aware of the affiants' identities from previous
document requests concerning them and was thus on notice that they were potential witnesses.
2008 WL 4449335, at *2–3; see also Lore, 2005 WL 3095506, at *2 ("While it may be true that
plaintiff failed to adhere to the letter of the discovery rules, the court is convinced that
defendants were sufficiently aware of the existence and relevance of the persons in question so
that defendants are not being subjected to trial by ambush.").

Similarly, here, on February 9, 2012, in response to the Defendant's Interrogatories, the
Plaintiff listed Dr. Gerard and indicated she was a medical professional who was involved in the
Plaintiff's treatment following the January 6, 2010 accident. (Falk Aff., Ex. 2.) In addition, in
response to Interrogatory No. 10, the Plaintiff listed "Paloma Health Care," where Dr. Gerard
practices, as the Plaintiff's treating physician. (Falk Aff., Ex. 2.) Moreover, the Defendant
admitted during the Plaintiff's deposition that the Defendant received medical reports from Dr.
Gerard's office pursuant to a subpoena. (Schumacher Decl., Ex. 1 at 59: 5–10.) Such evidence
clearly shows that the Defendant (1) was aware that Dr. Gerard was a potential witness and (2)
had the opportunity to depose her before the close of discovery. Accordingly, the Court finds
that the Defendant will not be prejudiced by the delayed submission of Dr. Gerard's affidavit.

Further, it appears that Dr. Gerard's affidavit was created by the Plaintiff for the purpose of opposing the Defendant's summary judgment motion.  See Dupree v. Klaff's Inc., 462 F. Supp. 2d 233, 235 n.2 (D. Conn. 2006) ( "[A]ffidavits appearing to have been created for summary judgment purposes are not required to be disclosed during discovery (as they likely did not exist then) and, additionally, plaintiff had the opportunity to depose these affiants."); Palma v. Pharmedica Commc'ns, Inc., CIV.3:00CV1128 (AHN), 2002 WL 32093275, at *2 (D. Conn. Mar. 27, 2002) (denying a plaintiff's motion to strike affidavits attached to the defendant's motion for summary judgment because it "[did] not appear to be a situation where the defendant was withholding documents in order to ambush the plaintiff" but rather (1) "[i]t [wa]s likely that the documents were created solely to support the summary judgment motion and would not have existed but for that motion" and (2) "the [p]laintiff deposed the affiants and had a full opportunity to explore the facts known to each").

In addition, the Court finds the Defendant's reliance on Ebewo, 309 F. Supp. at 606–07, to not be definitive.  In Ebewo, the court found that a physician's affidavit offered by the plaintiff was inadmissible because it was from an expert witness who had not been previously disclosed in accordance with Fed. R. Civ. P. 26(a)(2).  309 F. Supp. at 606–07.  The Ebewo court rejected the plaintiff's argument that the physician was one of his treating physicians because he did not have an ongoing relationship with the plaintiff and only examined the plaintiff after discovery closed.  Id. at 606.

In reaching its conclusion, the Ebewo court reasoned as follows:

> This is not a complex case with changing issues, or in which theories and litigation strategy must be allowed to develop as evidence is discovered and the case progresses toward trial.  It is a simple negligence case. The issues are straightforward and the facts that plaintiffs must prove have been clear from the time that they filed their Amended Complaint. Plaintiffs have an obligation

to gather the evidence necessary to prove their case, and upon defendant's proper discovery requests, to make that evidence available to defendant, on or before the close of discovery.

Id. at 608 (quoting 251 CPW Hous. LTd. v. Paragon Cable Manhattan, No. 93 Civ. 0944 (JSM), 1995 WL 70675, at *4–5 (S.D.N.Y. Feb. 21, 1995)).   The Ebewo court further explained that it would be unfair to the defendants if the plaintiff was permitted to "cobble together the evidence needed to oppose summary judgment only after the date specified by [the discovery schedule] for the close of expert discovery, and only after the defendant had submitted his motion for summary judgment."  Id.; see also Crucey–Castillo v. United States, No. 06 Civ. 11462(DC), 2009 WL 564287, at *5 (S.D.N.Y. Mar. 5, 2009) (finding an expert's report, which was attached to the plaintiff's opposition to the defendant's motion for summary judgment, to be inadmissible where the plaintiff failed to identify the expert to the defendant during discovery and did not reveal the medical report until serving the defendant with its opposition papers).

Conversely, as discussed above, (1) Dr. Gerard is not considered an expert under Fed. R. Civ. P. 26(a)(2); (2) she examined the Plaintiff multiple times before discovery closed; and (3) the Defendant reviewed Dr. Gerard's medical reports during discovery.  (Schumacher Decl., Ex. 1 at 59: 5–10.)  Thus, while some of the reasoning from Ebewo could be applicable here, the crucial element is whether the Defendant will be prejudiced as a result of the Plaintiff's delay.  In contrast to the situation presented in Ebewo, there was no prejudice in this case because Dr. Gerard was the Plaintiff's treating physician and the Defendant had knowledge of Dr. Gerard's identity and that she was a potential witness well before the close of discovery.

In sum, the Defendant has failed to establish that Dr. Gerard's untimely affidavit will result in prejudice or was produced in bad faith by the Plaintiff.  As such, for these reasons, the Defendant's motion to strike the affidavit of Dr. Marie G. Gerard is denied.

## II. THE FACTUAL BACKGROUND

Unless otherwise stated, the following facts are drawn from the exhibits accompanying the Defendant's motion for summary judgment, the Plaintiff's opposition papers and the Defendant's reply. The facts are construed in the light most favorable to the Plaintiff as the nonmoving party.

### A. The Plaintiff's Employment Background

From 1997 to approximately February of 2011, the Plaintiff worked in construction as a spackler for Partition Plus in Blairstown, New Jersey. (Schumacher Decl., Ex. 1 at 24:22–25.) The Plaintiff's responsibility as a spackler was to "finish [the] dry wall before painting," which involved "tap[ing] the walls, the seams in the wall, [and] the butt joints." (Id. at 26:2–12.) The job of taping the walls required the Plaintiff to bend over to tape or spackle the bottom of the walls and to reach over his head to spackle the top of the walls and the ceiling. (Id. at 28:10–25.) The Plaintiff's job also included lifting ladders and "can[s] of compound" or spackle, which weighed approximately fifty to sixty pounds. (Id. at 26:20–27:2–15.) In addition, the Plaintiff climbed up and down ladders approximately twenty times during a workday. (Id. at 29: 2–16.) Further, his job as a spackler included standing on his feet for about six of the seven hours he typically worked. (Schumacher Decl., Ex. 1 at 27:24–28:9.) Currently, the Plaintiff is unemployed. (Id. at 22:18–21.)

### B. The Plaintiff's 1974 Back Injury

In approximately 1974, the Plaintiff injured the middle portion of his lower back when he was pushed from behind while playing basketball. The Plaintiff neither received medical treatment nor experienced physical limitations as a result of the injury. This back injury resolved

itself in approximately two weeks and the Plaintiff continued to play basketball for years without physical limitations.  (Schumacher Decl., Ex. 1 at 49:20–50:10–25; 51:5 –17.)

## C. The Plaintiff's 2002 Neck and Back Pain

From February 5, 2002 to February 27, 2002, on nine different occasions, the Plaintiff received medical treatment from Dr. Lauren Stimler-Levy ("Dr. Stimler-Levy") for neck and back pain.  (Schumacher Decl., Ex. 1.G.)  On February 5, 2002, the Plaintiff complained of "a lot of tightness in the neck area" and "chronic low back pain." (Id.)  According to the initial evaluation, dated February 5, 2002, the Plaintiff maintained "a three year history of constant numbness and tingling sensation to the right side of the neck with radiation to the top of the head."  (Id.)  On examination of the Plaintiff's cervical spine, "there [was] bilateral paracervical tightness noted to palpation."  (Id.) In relation to the Plaintiff's thoracic spine, the examination revealed "upper trapezius tightness with mild tenderness noted to palpation on the left side." (Id.)  The following impressions were also noted: "[o]ccipital neuralagia, [c]ervical strain/sprain, [and] [l]umbar strain/sprain."  (Id.)  The Plaintiff was placed on a treatment plan, which included physical therapy three times a week.  (Id.)

On February 6, 2002, during the next therapy session, the Plaintiff stated that there was "no change in the degree of neck pain" and indicated that "there [was no] change in the lower back pain since the last treatment."  (Id.)  On a "1 to 10 scale," the Plaintiff evaluated his pain and discomfort in his neck and lower back as a "10."  (Id.)  The objective findings by Dr. Stimler-Levy noted (1) "a severe amount of restricted joint function C1, C2, C6, L4, and L5"; (2) "fairly severe pain . . . at C1, C2, C6, L4, and L5 bilaterally"; and (3) "[o]n palpitation, complete spasm subocciptal muscles and lumbar paraspinal muscles bilaterally[.]"  (Id.)  At the session on

February 6, 2002, Dr. Stimler-Levy treated the Plaintiff with an "adjustment to the low back region and neck to correct joint dysfunction of the vertebral segments." (Id.)

On February 9, 2002, at his next therapy session with Dr. Stimler-Levy, the Plaintiff again expressed that there were no changes in the level of pain in both his neck and back, evaluating the pain as a "10." (Id.) Dr. Stimler-Levy again indicated that the Plaintiff was suffering from (1) a "substantial amount of fixation of the spinal joints C1, C2, C6, L4, and L5"; (2) "severe intensity of pain at C1, C2, C6, L4, and L5 bilaterally"; and (3) "a severe muscle spasm suboccipital muscles and lumbar paraspinal muscles bilaterally." (Id.) Once again, Dr. Stimler– Levy's treatment consisted of "manual adjustment to the lumbar spinal area and cervical spine, in order to help improve mobility and vertebral alignment." (Id.)

During his February 11, 2002 therapy session with Dr. Stimler-Levy, the Plaintiff stated that his cervical pain and lower back pain remained unchanged at a pain level of "10." (Id.) Dr. Stimler-Levy again treated the Plaintiff for joint restriction and severe pain at C1, C2, C6, L4, and L5. (Id.) She also noted "a severe hypertonic muscle spasm suboccipital muscles and lumbar paraspinal muscles bilaterally." (Id.) Dr. Stimler-Levy's rendered the same treatment as the previous therapy sessions. (Id.)

On February 14, 2002, at another therapy session with Dr. Stimler-Levy, the Plaintiff stated that his neck and lower back pain remained unchanged at a pain level of "10." (Id.) On examination, Dr. Stimler-Levy observed the same findings as the previous therapy session and she continued the same treatment of "manual manipulation . . . to the lumbar spinal area and cervical spinal area, in order to correct somatic dysfunction and decrease vertebral fixation." (Id.)

During the February 18, 2002 therapy session with Dr. Stimler-Levy, the Plaintiff reported that his neck and lower back pain remained unchanged and evaluated both as a "10."

(Id.)  As to the objective findings, Dr. Stimler-Levy once again discovered (1) a "severe degree of joint fixation C1, C2, C6, L4, and L5"; (2) "[o]n palpation examination[,] . . . a severe pain intensity at C1, C2, C6, L4 and L5 bilaterally"; and (3) also on palpitation examination, a "complete spasm suboccipital muscles and lumbar paraspinal muscles bilaterally[.]"  (Id.)  Dr. Stimler-Levy's performed the same treatment as she did in the previous therapy sessions.  (Id.)

On February 20, 2002, at the next session with Dr. Stimler-Levy, the Plaintiff reported a "definite reduction in severity" in relation to both his neck and back pain.  (Id.)  However, regarding the neck pain, the Plaintiff noted "constant very severe restricted movement and stiffness and tingling sensations and numb sensations as well as sharp pain radiating to the head." (Id.)  Concerning the back pain, the Plaintiff complained of "constant very severe restricted movements as well as sharp pain generalized in the lower back."  (Id.)  The Plaintiff evaluated both his neck and low back pain as a "9."  (Id.)  Dr. Stimler-Levy's objective findings during examination and subsequent treatment remained consistent with the previous therapy sessions. (Id.)

Five days later, on February 25, 2002, the Plaintiff had another therapy session with Dr. Stimler-Levy.  (Id.)  During the session, the Plaintiff asserted that his neck and back pain had remained unchanged and evaluated both as a "9."  (Id.)  Dr. Stimler-Levy's objective findings showed again a "very significant degree of joint restriction C1, C2, C6, L4 and L5" along with "a strong pain level at C1, C2, C6, L4 and L5 bilaterally" and "severe muscle spasms subocciptal muscles and lumbar paraspinal muscles bilaterally."  (Id.)  The Plaintiff's "lumbar region and cervical spine received adjustment to correct spinal misalignment."  (Id.)

On February 27, 2002, during the Plaintiff's last therapy session with Dr. Stimler-Levy, the Plaintiff reported "improvement of his neck pain at 20% and low back pain at 20%,"

evaluating the pain level as an "8." (Id.) Regarding his neck pain, the Plaintiff again noted "constant very severe restricted movement and stiffness and tingling sensations and numb sensations as well as sharp pain radiating to the head." (Id.) As to his back pain, once more, the Plaintiff mentioned "constant very severe restricted movements as well as sharp pain generalized in the lower back." (Id.) Dr. Stimler-Levy's examination results and treatment remained unchanged from the previous therapy sessions. (Id.)

**D. The Plaintiff's 2004 Motor Vehicle Accident**

On May 27, 2004, the Plaintiff was injured in a motor vehicle accident when his vehicle was rear-ended. (Schumacher Decl., Ex. 1 at 42:22–43:10, 44:10–15.) Beginning on June 11, 2004 and continuing through May 3, 2005, a period of almost eleven months, the Plaintiff received medical treatment from a chiropractor, Dr. Marie G. Gerard. (Id. at 58:6–15, 59:5–21.) He was injured in the lower back and in the neck.

On June 11, 2004, Dr. Gerard's original diagnosis indicated that the Plaintiff's injuries included "[l]umbosacral sprain/s[t]rain, lumbar subluxation, cervical sprain/s[t]rain, muscle spasms." (Schumacher Decl., Ex. 1.H.) The Plaintiff subsequently met with Dr. Gerard on the following six days: August 2, 2004; August 23, 2004; October 6, 2004; November 30, 2004; December 29, 2004; and May 2, 2004. (Id.; Schumacher Decl., Ex. 1.J.) On each of the aforementioned dates, Dr. Gerard reported the same "Updated Diagnosis" of the Plaintiff: "846.0 Lumbosacral Sprain/Strain 739.3 Lumbar subluxation 724.4 Lumbosacral Radicular Syndrome 847.0 Sprain/Strain Injury to Cervical Area." (Schumacher Decl., Ex. 1.H; Schumacher Decl., Ex. 1.J.) In a report filed on May 3, 2005, Dr. Gerard noted that during the Plaintiff's last visit on May 2, 2005, the Plaintiff maintained "difficulty with moderate standing, walking, bending; difficulty with moderate sitting; difficulty with light, repeated lifting;

difficulty with light, repeated twisting and turning neck and low back; stiffness, upon rising."
(Schumacher Decl., Ex. 1.J, caps removed.)  In this same report, Dr. Gerard also concluded that
the Plaintiff was "totally disabled."  (Id.)

Due to the injuries that the Plaintiff sustained as a result of the May 27, 2004 motor
vehicle accident, Dr. Gerard supplied the Plaintiff with "Disability Certificate[s]," which
certified that the Plaintiff was unable to work from May 27, 2004 through April 30, 2005.
(Schumacher Decl., Ex. 1.I.)  Throughout this time period, the Plaintiff received Workers'
Compensation benefits.  (Schumacher Decl., Ex. 1 at 64:16–65:22.)  On May 3, 2005, the
Plaintiff returned to work, and according to the Plaintiff, he no longer experienced any physical
limitations from the May 27, 2004 motor vehicle accident.  (Id. at 66:10–12; 70:12–17.)

Between May 3, 2005 and January 2010, the Plaintiff did not receive treatment from Dr.
Gerard or any other medical professional.  (Id. at 67:23–68:12.)

**E. The January 6, 2010 Motor Vehicle Accident**

On January 6, 2010, the Plaintiff claims he sustained injuries when the Defendant's 2009
Chevrolet Suburban SUV struck his 2001 Chevrolet Suburban SUV in the rear at the Farmers
Boulevard exit of the Belt Parkway.  (Schumacher Decl., Ex. 1 at 73:18–74:8.)  At the time of
the accident, the Defendant's motor vehicle was being operated by Tennis, an employee of the
United States Fish and Wildlife Service who was acting within the scope of his employment.  (Id.
at 75:6– 19.)  The United States Fish and Wildlife Service is a bureau within the United States
Department of the Interior, which is a cabinet level agency of the Defendant United States of
America.  (Schumacher Decl., Ex. 1.D.)

According to the Plaintiff, as his car was "easing out" into the intersection at the Farmers
Boulevard exit, the Defendant's motor vehicle struck his automobile's "back driver's side

bumper." (Schumacher Decl., Ex. 1 at 72:2–17, 77:4–10.) The Plaintiff estimates that the Defendant's vehicle was traveling at fifteen to twenty miles per hour when it struck the Plaintiff's vehicle. (Id. at 78:22–79:8.)

The impact of the accident did not cause the Plaintiff's front airbag or any other airbag in the Plaintiff's vehicle to deploy. (Id. at 76:23–77:3.) While the Plaintiff's body did propel forward, it did not make contact with the steering wheel or the dashboard. (Id. at 83:11–22.) However, the Plaintiff claims that he experienced pain in the back of his neck immediately after the impact. (Id. at 91: 10–16.) A couple of minutes after the accident, the Plaintiff was able to get out of his car and move around. (Id. at 94:6– 95:19.)

The police arrived approximately thirty to forty-five minutes after the subject accident, and at that time, the Plaintiff told the police that his "neck [was] bothering [him]." (Schumacher Decl., Ex. 1 at 93:20–94:2, 96:13–17.) No ambulance arrived at the scene, and the Plaintiff did not ask for medical attention. (Id. 96:21–25.) The responding police officer's accident report stated that there were "no injuries." (Id. at 97:5–10; Schumacher Decl., Ex. 1.E.) After the accident, the Plaintiff drove his car from the scene back to his home. (Schumacher Decl., Ex. 1 at 97:12–16.)

## F. The Purported Effects from the January 6, 2010 Motor Vehicle Accident

As indicated above, as result of the January 6, 2010 accident, the Plaintiff did not suffer any dismemberment, lose any limbs, become disfigured, or suffer any fractures. (Id. at 86:4–22.) However, the Plaintiff claims the he suffered injuries to his neck and lower back. On January 7, 2010, the Plaintiff visited Dr. Gerard in connection with the alleged injuries that he sustained as a result of the accident. (Schumacher Decl., Ex. 1 at 104:14–18; Falk Aff., Ex. 3.) During this initial therapy session, Dr. Gerard characterized the Plaintiff as "partially disabled." (Falk Aff.,

Ex. 3.) For a period of fourteen months thereafter, through March 18, 2011, the Plaintiff sought and received medical treatment from Dr. Gerard several times a week. (Id.)

In addition, on January 10, 2010 and January 17, 2010, after his first visit with Dr. Gerard, the Plaintiff received emergency treatment at Franklin General Hospital for his alleged injuries. (Schumacher Decl., Ex. 1.B.) During one of these emergency visits, the Plaintiff was x-rayed, the results of which confirmed a mild straightening of his cervical lordosis suggesting an underlying spasm. (Id.)

Also, on August 8, 2010, while still being treated by Dr. Gerard, the Plaintiff had an MRI of his cervical spine. (Schumacher Decl., Ex. 1.K.) This MRI was conducted by Elmont Open MRI. (Id.) The MRI, like the x-ray, confirmed a straightening of the cervical lordosis. (Id.) The MRI further showed disc bulges at C3–4, C4–5 and C6–7 and narrowing of the right and left lateral recesses extending to the right and left neural foramina. (Id.) This caused stenosis and crowding of the exiting nerve roots. (Id.)

On August 25, 2010, the Plaintiff sought medical treatment at Orlin & Cohen Orthopedic Associates and was examined by Dr. Micheal B. Shapiro, M.D. ("Dr. Shapiro"). (Id.) The Plaintiff complained of neck pain, which the Plaintiff described as a "5" on a scale of "0–10." (Id.) The cervical examination revealed "pain, muscle spasm, diminished flexibility, diminished extension, diminished rotation, and diminished lateral bending." (Id.) During the August 25, 2010 visit, the Plaintiff was diagnosed with "[c]ervicalgia, [h]erniated [n]ucleus [p]ulposus, [and] [c]ervical [r]adiculopathy." (Id.)

On October 6, 2010, Dr. Gerard wrote a letter to the Plaintiff's attorney, affirming the statements set forth above. (Falk Aff., Ex. 3.) In the letter, Dr. Gerard detailed the Plaintiff's range of motion testing for both the Plaintiff's thoraco-lumbar and cervical spines. (Id.) Dr.

Gerard found that in degrees with the second number being normal, the range of motion for the Plaintiff's thoraco-lumbar spine was 60/90 flexion; 20/30 degrees extension; 25/35 right lateral flexion; 25/35 left lateral flexion; 20/30 right rotation; and 20/30 left rotation. (Id.) In addition, in degrees with the second number being normal, the range of motion for the Plaintiff's cervical spine was 20/50 flexion; 40/70 extension; 15/45 right lateral flexion; 20/45 left lateral flexion; 20/85 right rotation; and 30/85 left rotation. (Id.) Dr. Gerard also confirmed the findings in the MRI report conducted by Elmont Open MRI and concluded that the Plaintiff's injuries were caused by the January 6, 2010 accident. (Id.) On March 18, 2011, the Plaintiff ceased treatment with Dr. Gerard. (Id.)

Thereafter, on January 5, 2012, the Plaintiff returned to Elmont Open MRI for further MRI testing. (Id.) The MRI testing of the cervical spine revealed "broad-based disc bulging noted at C3–4, C4–5 and C5–6" with "central disc bulge noted at the C6–7 level as above." (Id.) In addition, on that same date, Elmont Open MRI conducted an MRI of the Plaintiff's lumbar spine, concluding that "broad based disc bulges are noted at the L2–3, L3–4, L4–5 and L5–S1 levels." (Id.)

On November 30, 2012, more than one year and eight months after she last treated the Plaintiff, Dr. Gerard prepared a sworn affidavit stating that she conducted physical examinations and measured decreased ranges of motion of the Plaintiff's cervical and lumbar spine. (Falk Aff., Ex. 3.) Dr. Gerard also confirmed that the August 8, 2010 MRI evaluation revealed bulging discs of the cervical spine. (Id.) Based on this MRI evaluation and her own records and reports, Dr. Gerard stated that "to a reasonable degree of chiropractic certainty," the Plaintiff's injuries "were caused by the motor vehicle accident on January 6, 2010." (Id.) Moreover, as a result of the limitations in the full range of motion of the spine, Dr. Gerard concluded that the Plaintiff

was "permanently partially disabled" due to the January 6, 2010 accident. (Id.) Dr. Gerard also determined "[t]hat the [alleged] limitations in [the Plaintiff's] physical activities, including difficulty in sitting, standing, or walking for any extended period of time, in climbing stairs and lifting heavy objects and the patient's inability to perform normal daily activities[,] [we]re the natural and expected consequences of [his] injuries." (Id.)

To the present date, to the Plaintiff's recollection, no physician has placed any restrictions on the Plaintiff's activities, including his ability to work. (Schumacher Decl., Ex. 1 at 87:17–21.) Moreover, from January 6, 2010 to an unspecified date in February of 2011, the Plaintiff never declined work nor received any "disability certificates" from Dr. Gerard, which, as discussed above, she had given the Plaintiff after his May 27, 2004 motor vehicle accident. (Id. at 36:24– 37:3, 65:23–66:2.) However, unlike after his May 27, 2004 accident, the Plaintiff was not working at the time of the January 6, 2010 accident and is currently unemployed. (Id. at 22:18–21; 32:10–14.)

During his deposition, the Plaintiff alleged that he has faced limitations that have (1) affected his ability to perform chores around the house; (2) made him "stay home more"; and (3) produced depression. (Id. at 109:3–13.) Those chores that he had previously been able to perform, but which he was unable to perform following the January 6, 2010 accident, were (1) taking out the garbage about three times a week and (2) cutting the grass in about ten minutes once a week. (Id. at 109:14–22; 41:14–16; 110: 8–11.) In this regard, after January 6, 2010, the Plaintiff claimed that his injury affected his ability to "lift a garbage can," and as a result, he was unable to take the garbage out until "a few months afterwards." (Schumacher Decl., Ex. 1 at 110:6–21.) The Plaintiff also stated that he was limited in cutting the grass "immediately after"

the accident.  (Id. at 110:2–5.)  Beginning in March 2010, the Plaintiff allegedly was unable to "cut the grass" for approximately a month.  (Id. at 111:2–23.)

With respect to the Plaintiff's claim that he had to "stay at home more," the Plaintiff alleged that his "energy level" fell following the January 6, 2010 accident.  (Id. at 112:3–9.)  The Plaintiff could not recall how long his "energy level [had been] low," but asserted that he did not pick up his son from school as frequently as a result of his energy level.  (Id. at 112:13– 13:6; 113:14–18.)  Before the subject accident, the Plaintiff picked his son up from school every day, but after January 6, 2010 until March or April of 2010, he was only able to do so approximately once a week.  (Schumacher Decl., Ex. 1 at 113: 19–24.)

As to the Plaintiff's alleged depression, the Plaintiff conceded that he never sought treatment with a psychiatrist or psychologist and that he was not clinically diagnosed with depression or anxiety.  (Id. at 114:5–19.)  Of note, on August 25, 2010, the Plaintiff denied having anxiety or depression to Dr. Shapiro.  (Schumacher Decl., Ex. 1.K.)

**G. The Plaintiff's Alleged Property Damage from the January 6, 2010 Accident**

On February 3, 2010, the Plaintiff submitted a Standard 95 Claim for Damage, Injury or Death report to the United States Fish and Wildlife Service (the "Standard Form 95"). (Schumacher Decl., Ex. 1.D.)  The Standard Form 95 claims that the Plaintiff suffered $5,000 in property damages as a result of the January 6, 2010 accident.  (Id.)

In addition, at his deposition, the Plaintiff testified that his 2001 Chevrolet Suburban sustained damages and circled photographs containing the damaged areas.  (Schumacher Decl., Ex. 1 at 84:8–86:2; Schumacher Decl., Ex. 1.C.)  However, the Plaintiff admitted that he had no basis for the $5,000 property damage claim.  (Schumacher Decl., Ex. 1 at 100:6–8.)  Therefore, in his Fed. R. Civ. P. 56.1 Counter Statement of Facts, the Plaintiff asserts a claim for only

$1,000 in property damages.  (Plaintiff's Rule 56.1 Counter Statement of Facts at 4–5.)  This $1,000 figure is based on an estimate the Plaintiff received "in Freeport" sometime in March of 2010. (Schumacher Decl., Ex. 1 at 99:15–18.)  According to the Plaintiff, he has not paid any out-of-pocket expenses to fix his vehicle.  (Id. at 101:3–6.; Schumacher Decl., Ex. 1.B.)

### III. DISCUSSION

#### A. Legal Standard on a Motion for Summary Judgment

It is well-established that, when deciding a motion for summary judgment pursuant to Fed. R. Civ. P. 56(c), the Court may not grant such a motion unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 170 (2d Cir. 2006) (citing Fed. R. Civ. P. 56(c)).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam), and Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)).

When moving for summary judgment in a case involving the No-Fault Law and a claim for non-economic loss, the defendant has the initial burden "to make an evidentiary showing that the plaintiff has not sustained a serious injury as a matter of law." Lawyer v. Albany, 142 A.D.2d 871, 872, 530 N.Y.S.2d 904, 906 (3d Dep't 1988) (citation and internal brackets

omitted); see also Conley v. United States, 08CV820A, 2010 WL 6370542, at *4 (W.D.N.Y. Sept. 2, 2010), report and recommendation adopted by, 08-CV-820, 2011 WL 1156707 (W.D.N.Y. Mar. 28, 2011) ("Under this law, defendant has the initial burden of establishing a prima facie case that plaintiff has not sustained any 'serious injury' under Insurance Law § 5104."). "The defendant may satisfy this initial burden with unsworn reports by the plaintiff's physicians or with sworn affidavits or affirmations by the defendant's own retained physicians[.]" Thomas v. O'Brien, 08-CV-3250 (RLM), 2010 WL 785999, at *7 (E.D.N.Y. Feb. 26, 2010).

Once the defendant has met his burden, the burden shifts to the plaintiff to "overcome [the defendant's] motion by demonstrating that [he] sustained a serious injury." Gaddy v. Elder, 79 N.Y.2d 955, 582 N.Y.S.2d 990, 591 N.E.2d 1176 (1992); see also Mueller v. Seatainer Transp., Ltd., 816 F. Supp. 2d 206, 210–11 (W.D.N.Y. 2011) ("If the defendant makes [a] prima facie showing [that the plaintiff has not sustained a serious injury within the meaning of the statute], the burden then shifts to the plaintiff to defeat the motion by submitting sworn affidavits or affirmations by her physicians that support her claim of serious injury."). In this regard, "a plaintiff must offer objective proof of an injury." Rivera v. United States, 10 CIV. 5767 MHD, 2012 WL 3132667, at *10 (S.D.N.Y. July 31, 2012). Therefore, a "[p]laintiff must [ ] offer admissible evidence in the form of sworn affidavits or reports by physicians, or sworn medical test records, such as MRI reports." Id.; see also Berroa v. United States, 07 CIV. 3521 (DAB), 2010 WL 532862, at *3 (S.D.N.Y. Feb. 5, 2010) ("For a plaintiff to defeat a summary judgment motion, admissible evidence must be presented in the form of sworn affidavits by physicians."). "As long as the plaintiff adduces sufficient objective evidence from which a jury could find that she sustained a serious injury, summary judgment must be denied 'notwithstanding some

contrary probative evidence.'" Rivera, 2012 WL 3132667, at *10 (quoting Nasrallah v. Helio De, No. 96 CIV. 8727(SS), 1998 WL 152568, at *8 (S.D.N.Y. Apr. 2, 1998)).

On the other hand, a plaintiff's "subjective complaints alone cannot defeat summary judgment." Id. In addition, unsworn letters or medical reports from physicians submitted by a plaintiff in opposition to a summary judgment motion are inadmissible evidence that may not be considered. See Robinson v. United States, 02 CIV. 5166DF, 2005 WL 747039, at *6 (S.D.N.Y. Mar. 31, 2005) ("It is well established that unsworn medical reports are not a form of admissible evidence capable of demonstrating a serious injury."); Molina v. United States, 301 F. Supp. 2d 317, 321 (S.D.N.Y. 2004) ("The evidence of [the plaintiff's] bulging discs is inadmissible because it is based solely upon an unsworn report from a doctor who has not submitted a sworn affidavit or otherwise participated in this litigation.") (citing Friedman v. U-Haul Truck Rental, 216 A.D.2d 266, 266, 627 N.Y.S.2d 765, 766 (2d Dep't 1995)). See also Lowe v. Bennett, 122, A.D.2d, 728, 730, 511 N.Y.S.2d 603, 604 (1st Dep't 1986); Parmisani v. Grasso, 218 A.D.2d 870, 871–72, 629 N.Y.S.2d 865, 865 (3d Dep't 1995); Dwyer v. Tracey, 105 A.D.2d 476, 478, 480 N.Y.S.2d 781, 784 (3rd Dep't 1984).

Further, of importance, unlike a physician's affirmation, an affirmation from a chiropractor is not admissible unless the chiropractor "first appear[s] before a notary or other such official and formally declare[s] the truth of the contents of the document." Doumanis v. Conzo, 265 A.D.2d 296, 296, 696 N.Y.S.2d 201, 203 (2d Dep't 1999); see also Feggins v. Fagard, 52 A.D.3d 1221, 1223, 860 N.Y.S.2d 346, 349 (4th Dep't 2008) ("We agree with defendants that the affirmed report of the chiropractor is not in admissible form inasmuch as it was not sworn to before a notary or other authorized official."). However, attached reports to physician affidavits including unsworn MRI reports interpreted by the physician's affidavit are

considered admissible evidence.  See Alvarez v. East Penn Mfg. Co., No. 10 Civ. 09541 (RKE),

2012 WL 4094828, at *5 (S.D.N.Y. Sept. 17, 2012) ("[T]o the extent the experts incorporated

into their affirmations several unsworn reports of other doctors who examined plaintiff, these

unsworn reports were not the only evidence submitted by plaintiff in opposition to the motion,

and may be considered to deny a motion for summary judgment.") (quoting Rivera v. Super Star

Leasing, Inc., 57 A.D.3d 288, 288, 868 N.Y.S.2d 665, 666 (1st Dep't 2008)) (internal brackets

omitted).

      Finally, in order to recover for non-economic losses under the No Fault Law, a plaintiff

not only has to prove that he sustained a serious injury as defined by N.Y. Ins. Law. § 5102(d),

but he also must show that "the injury was proximately caused by the accident at issue."  Carter

v. Full Service, Inc., 29 A.D.3d 342, 344, 815 N.Y.S.2d 41, 43 (1st Dep't 2006); see also

Pommells v. Perez, 4 N.Y.3d 566, 797 N.Y.S.2d 380 (2005), 572 830 N.E.2d 278 ("[W]hen

additional contributory factors interrupt the chain of causation between the accident and claimed

injury—such as a gap in treatment, an intervening medical problem or a preexisting condition—

summary dismissal of the complaint may be appropriate.").  With respect to pre-existing injuries,

a defendant moving for summary judgment is required to submit "persuasive evidence" as to the

existence of the plaintiff's pre-existing injuries. See Arenes v. Mercedes Benz Credit Corp., No.

03 CV 5810(NG)(MDG), 2006 WL 1517756, at *8 (E.D.N.Y. June 1, 2006); Pommells, 4

N.Y3d at 580.  If the Defendant meets its burden, the burden shifts to the Plaintiff to "come

forward with evidence addressing the defendant's claimed lack of causation."  See Arenes, 2006

WL 1517756, at *8; Pommells, 4 N.Y.3d at 580.  If the Plaintiff fails to provide such evidence,

the Defendant is entitled to summary judgment. See Arenes, 2006 WL 1517756, at *8; Pommells,

4 N.Y.3d at 580.

## B. The Governing Substantive Law

Under the FTCA, a plaintiff may recover "for . . . personal injury . . . caused by the negligent . . . act or omission or any employee of the Government while acting under the scope of his (or her) office or employment, under circumstances which the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b) (2011). An "employee of the Government" encompasses "offices or employees of any federal agency" including the executive departments of the United States of America. 28 U.S.C. § 2671 (2000). Here, Tennis works for the United States Fish and Wildlife Service, which is an executive department of the United States of America. At the time of the accident, Tennis was acting within the scope of his employment. (Schumacher Decl., Ex. A.)

Further, because the subject motor vehicle accident occurred in the State of New York, New York law applies. See Molzof v. United States, 502 U.S. 301, 305, 112 S. Ct. 711, 116 L. Ed. 2d 731 (1992) ("[T]he extent of the United States liability under the FTCA is generally determined by reference to state law."); Goldstein v. United States, 9 F. Supp. 2d 175, 186 (E.D.N.Y. 1998) (in an FTCA action, holding that "as the accident in question occurred in New York, liability is to be determined under the law of New York"). In this regard, pursuant to the provisions of § 5104 of New York's No-Fault Law, a plaintiff cannot recover for personal injuries arising from an automobile accident unless the plaintiff proves that he suffered a "serious injury" as a result of said accident.

N.Y. Ins. Law. § 5102(d) defines "serious injury," in relevant part, as follows:

> permanent loss of use of a body organ, member, function or
> system; permanent consequential limitation of use of a body organ
> or member; significant limitation of use of a body function or
> system; or a medically determined injury or impairment of a non-
> permanent nature which prevents the injured person from
> performing substantially all of the material acts which constitute
> such person's usual and customary daily activities for not less than
> ninety days during the one hundred eighty days immediately
> following the occurrence of the injury or impairment.

(See also Falk Aff. in Opp, Ex. 2.)  Of importance, a major goal of the legislature in enacting the

No-Fault Law was to "keep minor personal injury cases out of court."  Licari v. Elliott, 57

N.Y.2d 230, 236, 455 N.Y.S.2d 570, 441 N.E.2d 1088 (1982).  The Second Circuit further

delineated the purpose of the No-Fault Law, stating that "[a] major objective of New York's no-

fault insurance law is to eliminate most auto accident tort suits in order to reduce the burden on

courts."  Rosa v. Allstate Ins. Co., 981 F.2d 669, 676 n.15 (2d Cir. 1992).

In order to establish a "permanent loss of use of a body organ, member, function, or

system" under § 5102(d), a plaintiff must show that the loss is a total loss.  Oberly v. Bangs

Ambulance Inc., 96 N.Y.2d 295, 298, 727 N.Y.S.2d 378, 751 N.E.2d 457 (2001) ("We hold that

to qualify as a serious injury within the meaning of the statute, 'permanent loss of use' must be

total."); Best v. Bleau, 300 A.D.2d 858, 860, 752 N.Y.S.2d 427, 429 (3rd Dep't 2002) ("In order

to satisfy this [permanent loss of use of a body organ, member, function or system] category of

serious injury, any permanent loss of use must indeed be total.") (internal quotation marks and

citation omitted).

To demonstrate a "permanent consequential limitation of use of a body organ or member,"

a plaintiff must "demonstrate more than 'a mild, minor or slight limitation of use.'"  Katiraeifar v.

Santrizos, 182 F.3d 900 (2d Cir. 1999) (quoting Booker v. Miller,  258 A.D.2d 783, 784, 685

N.Y.S.2d 837, 838 (3d Dep't 1999)). Indeed, "consequential limitation" instead means an important and qualitative limitation of use of a body part based on normal function, purpose and use of that body part. Toure v. Avis Rent-A-Car Sys., 480 N.Y.2d 345, 353, 746 N.Y.S.2d 865, 774 N.E.2d 1197 (2002); Dwyer, 480 N.Y.S.2d at 783. Further, "[p]ermanence" in this context "is a medical determination that requires an objective basis, and mere repetition of the word 'permanent' in a medical report is insufficient." Alvarez, 2012 WL 4094828, at *5.

Similarly, with respect to the "significant limitation of use of a body function or system" category, "'the law [also] requires the limitation be more than minor, mild or slight and the claim must be supported by medical proof based upon credible medical evidence of an objectively measured and quantified medical injury or condition.'" Oved v. Salotti, No. 98Civ.5628(BSJ), 2000 WL 1099926, at *1 (S.D.N.Y. Aug. 7, 2000) (quoting Lanuto v. Constantine, 192 A.D.2d 989, 991, 596 N.Y.S.2d 944, 945 (3rd Dep't 1993)); see also Zavialov v. Morgan, No. 96–CV–5705 (JG), 2000 WL 133846, at *3 (E.D.N.Y. Jan. 13, 2000) (citing Licari, 57 N.Y.2d at 236). In this context, "[s]ignificant" means "important," Zavialov, 2000 WL 133846, at *3, which can be demonstrated through admissible medical evidence "detailing either a numeric percentage of [a plaintiff's] loss in range of motion, or a qualitative assessment of his condition that is based on objective medical information, and compared to 'normal' use," Alvarez, 2012 WL 4094828, at *5.

Lastly, in order to establish a "medically determined injury or impairment of a non-permanent nature which prevents the [plaintiff] from performing substantially all of the material acts which constitute [his] usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment" (the "90/180 day category "), a plaintiff must show that he was prevented "from

performing his usual activities to a great extent, rather than some slight curtailment" for ninety of the 180 days following the accident.  <u>Licari</u>, 57 N.Y.2d at 236.

## C.  As to Whether the Defendant Satisfied its Initial Burden

In this case, the Defendant has the initial burden of demonstrating that there exists no genuine issue of material fact under Fed. R. Civ. P. 56.  <u>Anderson</u>, 477 U.S. at 242.   In this regard, as discussed above, the Defendant has the initial burden of making an "evidentiary showing" that the Plaintiff did not suffer a "serious injury" pursuant to N.Y. Ins. Law § 5102(d). <u>Lawyer</u>, 530 N.Y.S.2d at 906.

The Court finds that the Defendant has met its burden by providing evidence that shows that the Plaintiff did not suffer a permanent injury, a significant limitation, or a non-permanent injury that limited substantially all of the Plaintiff's customary daily activities as defined by N.Y. Ins. Law. § 5102(d).  For example, the Plaintiff admitted in his deposition that he did not suffer any dismemberment, become disfigured, or maintain any fractures as a result of the January 6, 2010 motor vehicle accident.  (Schumacher Decl., Ex. 1 at 86: 4–22.)  Rather, the Plaintiff stated that the January 6, 2010 accident limited him by (1) affecting his ability to do things around the house, (2) making him "stay home more" due to "low energy levels" and (3) causing depression. (<u>Id.</u> at 22:18–21; 32: 10–14.)

However, as the Defendant points out, the Plaintiff's claims of depression and "low energy levels" are not supported by objective medical evidence.  Indeed, the Plaintiff admitted that he did not seek medical treatment for his depression or "low energy," and therefore, he has not been clinically diagnosed with depression or any other mental health problem.  (Schumacher Decl., Ex. 1 at 114: 8–19.)  The Plaintiff's subjective complaints concerning his mental state do not satisfy the serious injury threshold.  <u>Lowe</u>, 511 N.Y.S.2d at 604.

The Court also agrees with the Defendant that the Plaintiff's alleged limitations regarding household activities are also insufficient to establish that the Plaintiff suffered a serious injury. In this regard, at his deposition, the Plaintiff stated that his alleged injuries from the January 6, 2010 accident limited his ability to cut the grass, take out the garbage, and pick his son up from school. (Schumacher Decl., Ex. 1 at 109:14–22, 113:14–18.)  However, the Plaintiff resumed these activities either a month or a few months after the accident.  (Id. at 1110:16–25, 110:19–111:1–23, 114:25–115:2–9.)  Therefore, the Plaintiff admitted that following the January 6, 2010 accident, his activities were only limited for a short period of time.  As such, he neither suffered a "permanent loss of use of a body organ, member, function or system," nor a "permanent consequential limitation of use of a body organ or member."  Oberly, 96 N.Y.2d at 298; Dwyer, 480 N.Y.S.2d at 783.

Moreover, as the Defendant explains, the limitations of the Plaintiff's household activities were a "[m]inor, mild, or slight limitation of use."  Zavialov, 2000 WL 133846, at *4 (citing Licari, 57 N.Y.2d at 236).  In addition, no physician placed any restrictions on the Plaintiff's activities. (Schumacher Decl., Ex. 1 at 87:17–21.)  Thus, the Court finds that the Defendant has made a sufficient evidentiary showing that the Plaintiff did not suffer a "significant limitation" within the meaning of N.Y. Ins. Law § 5102(d).

Furthermore, in the Court's view, the Defendant has met its burden with regard to the 90/180 day category of N.Y. Ins. Law. § 5102(d).  For example, the Plaintiff admits that his ability to cut the grass was limited only for a month and, therefore, fails to satisfy the 90/180 day category.  (Schumacher Decl., Ex. 1 at 111:1–25.)  With respect to the Plaintiff's claims that he was limited with respect to taking out the garbage and picking up his son from school, these activities does not constitute "substantially all" of the Plaintiff's normal activities for 90 of the

first 180 days after the accident. Indeed, rather than limiting his normal activities to "a great extent," it appears to the Court that the Plaintiff's injuries only caused him to suffer a "slight curtailment" to his usual activities. Licari, 57 N.Y.2d at 236.

In addition, the Defendant also argues that the Plaintiff's injuries were pre-existent and, thus, not caused by the January 6, 2010 automobile accident. Arenes, 2006 WL 1517756, at *8; Pommells, 4 N.Y.3d at 572; Carter, 815 N.Y.S.2d at 43. In this regard, viewing the record in the light most favorable to the Plaintiff, the Court finds that the evidence concerning the Plaintiff's 1974 injury is not persuasive enough to be considered a pre-existing condition, as that injury occurred almost forty years ago and resolved within approximately two weeks. (Schumacher Decl., Ex. 1 at 49:20–50:10–25; 51:5 –17.)

However, the Court does find that the evidence regarding the Plaintiff's injuries in 2002 and 2004 are persuasive enough to shift the burden to the Plaintiff. Dr. Stimler-Levy in 2002 and Dr. Gerard in 2004 both observed neck and lower back injuries that are similar to the injuries that the Plaintiff claims were caused by the Defendant as a result of the January 6, 2010 accident. (Schumacher Decl., Ex. 1.G; Schumacher Decl., 1.H.) In 2002, Dr. Stimler-Levy consistently concluded that the Plaintiff sustained significant joint restrictions, strong pain levels, and severe muscle spasms in his neck and lower back. (Schumacher Decl., Ex. 1.G.) Dr. Stimler-Levy also made objective findings concluding that the Plaintiff experienced "severe amount of restricted joint function C1, C2, C6, L4, and L5 . . . fairly severe pain at C1, C2, C6, L4, L5 bilaterally [and] complete spasm subocciptal muscles and lumbar paraspinal muscles bilaterally." (Schumacher Decl., Ex. 1.G.) During each and every therapy session, Dr. Stimler-Levy treated the Plaintiff with physical therapy. (Id.)

Also, in 2004, Dr. Gerard found that the Plaintiff had "difficulty with moderate standing, walking, bending; difficulty with moderate sitting; difficulty with light, repeated lifting; difficulty with light, repeated twisting and turning neck and low back; stiffness, upon rising" due to his neck and low back injuries. (Schumacher Decl., Ex. 1.J, caps removed.) The Plaintiff's injuries were so severe that the Plaintiff missed approximately a full year of work in 2004–2005. (Schumacher Decl., Ex. 1.I.) Moreover, based on objective findings, Dr. Gerard reported that the Plaintiff sustained the following injuries: "846.0 Lumbosacral Sprain/Strain 739.3 Lumbar subluxation 724.4 Lumbosacral Radicular Syndrome 847.0 Sprain/Strain Injury to Cervical Area." (Schumacher Decl., Ex. 1.H; Schumacher Decl., Ex. 1.J.) Even though the Plaintiff stated that he did not experience physical limitations once returning to work, Dr. Gerard found that the Plaintiff was "totally disabled." (Schumacher Decl., 1 at 70:12–17; Schumacher Decl., 1.J.) Therefore, in the Court's view, the Defendant has presented "persuasive evidence" as to the Plaintiff's pre–existing injuries. The Court finds that these pre-existing injuries from 2004 and 2005 involved the same parts of the body as those allegedly sustained in the present 2010 accident, namely the cervical spine and lumbar spine; the neck and lower back.

Accordingly, the Defendant has satisfied its "serious injury" summary judgment burden and the burden now shifts to the Plaintiff to demonstrate that the Plaintiff did in fact suffer a serious injury under the provision of N.Y. Ins. Law § 5102(d) and also to prove causation. See Arenes, 2006 WL 1517756, at *8 ("When a defendant submits persuasive evidence that a plaintiff's alleged pain and injuries are related to a pre-existing condition, the plaintiff has the burden to come forward with evidence addressing the defendant's claimed lack of causation."); Gaddy 79 N.Y.2d at 956–57 (after the defendant "established a prima facie case that [the] plaintiff's injuries were not serious[,] . . . [t]he burden then shifted to [the] plaintiff to come

forward with sufficient evidence to overcome defendant's motion [for summary judgment] by demonstrating that she sustained a serious injury within the meaning of the No-Fault Insurance Law"); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ("[T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'") (quoting Fed. R. Civ. P. 56(e)).

**D.  As to Whether the Plaintiff Has Satisfied His Burden**

As stated above, in order to demonstrate that he suffered a serious injury, a plaintiff must submit admissible evidence "in the form of affidavits or affirmations . . . . Uncertified medical records and unsworn letters or reports are of no probative value."  629 Parmisani, N.Y.S.2d at 871–72.  In this case, the Plaintiff offers an unsworn MRI report, Dr. Gerard's medical reports and records and Dr. Gerard's sworn affidavit as proof that the Plaintiff suffered a serious injury. While unsworn reports and records standing alone would be inadmissible, because Dr. Gerard's sworn affidavit confirms the results of the MRI evaluation and verifies her records and reports, the Court may consider them to the extent that they are incorporated into Dr. Gerard's affidavit. See Alvarez, 2012 WL 4094828, at *5 (quoting Rivera, 868 N.Y.S.2d at 666); Cotto v. JND Concrete & Brick, Inc., 41 A.D.3d 415, 417, 837 N.Y.S.2d 728, 729 (2d Dep't 2007); Carter, 880 N.Y.S.2d at 468–69; Lazu v. Integral Truck Leasing, 292 A.D.2d 306, 307, 741 N.Y.S.2d 196, 197 (1st Dep't 2002).

Nevertheless, for a court to consider a physician's affidavit, the affidavit must be based upon a recent examination of the injured plaintiff or an adequate explanation must be offered in the absence of a recent examination.  See Hodder v. U.S., 328 F. Supp. 2d 335, 349 (E.D.N.Y. 2004) ("[T]here must be a recent examination of [the] plaintiff on which the objective medical findings have been made; any significant lapse of time between the cessation of the plaintiff's

medical treatments after the accident and the physical examination conducted by his own expert must be adequately explained.") (citations and internal quotation marks omitted); Park v. Orellana, 49 A.D.3d 721, 722, 854 N.Y.S.2d 447, 448 (2d Dep't 2008) ("[T]he evidence submitted by the plaintiff failed to raise a triable issue of fact as to whether he sustained a serious injury . . . . While the plaintiff's treating chiropractor opined in his affidavit that the plaintiff sustained permanent injuries and limitations to, among other things, his cervical spine as a result of the subject accident, this opinion was not based on a recent examination of the plaintiff."); Olson v. Russell, 35 A.D.3d 684, 685, 828 N.Y.S.2d 417, 419 (2d Dep't 2006) (finding that "the plaintiffs failed to raise a triable issue of fact" in part because "[w]hile the affirmation of the plaintiffs' examining orthopedic surgeon set forth range of motion findings that were compared to the normal range of motion and based on objective testing, it [was] unclear from that affirmation whether those findings were based on recent examinations of the injured plaintiff").

Here, Dr. Gerard's affidavit was based upon muscle spasm observations and range of motion tests that occurred from January 7, 2010 to March 18, 2011. (Falk Aff., Ex. 2.) Twenty months later, on November 30, 2012, apparently without any additional treatments or examinations, Dr. Gerard filed her affidavit. (Falk Aff., Ex. 3.) In a case involving soft tissue injuries, such a gap of time between the last examination and a physician's affidavit is generally insufficient to raise a triable issue as to whether the plaintiff suffered a serious injury. For example, in Rabolt v. Park, 50 A.D.3d 995, 858 N.Y.S.2d 197 (2d Dep't 2008), the New York State Appellate Division, Second Department (the "Second Department"), would not consider a physician's opinions expressed in an affirmation, since they were not based upon a recent examination as required under N.Y. Ins. Law § 5102(d). Id. at 199–200. In Rabolt, the physician's affirmation was dated July 12, 2006, but the doctor's opinions were based upon

examinations that occurred in 2004 and 2005.  Id.  Similarly, in Moore v. Edison, 25 A.D.3d 672, 811 N.Y.S.2d 724 (2d Dep't 2006), the Second Department held that where "[t]he plaintiff submitted the affirmation of her own treating physician who last treated the plaintiff almost two years prior to the defendant's motion[,] . . . the results of the examination [had] no probative value in the absence of a more recent examination."  Id. at 725.  See also Kauderer v. Penta, 261 A.D.2d 366, 366, 689 N.Y.S.2d 191, 191 (2d Dep't 1999) (finding that the chiropractor's affidavit was not based upon a recent examination because the gap was almost over three years); Thomas v. Roach, 246 A.D.2d 591, 591, 667 N.Y.S.2d 296, 296 (2d Dep't 1998) (finding that the chiropractor's affidavit was not based upon a recent examination because the gap was more than two years); Beckett v. Conte, 176 A.D.2d 774, 774–75, 575 N.Y.S.2d 102, 103 (2d Dep't 1991) (finding that the medical opinions were not based upon a recent examination because the examinations occurred two to three years prior to the affidavit).

As such, this Court finds that because the opinions conveyed by Dr. Gerard in her November 30, 2012 affidavit are not based upon a recent examination, the Plaintiff's submissions are insufficient to meet his summary judgment burden.  See Jimenez v. Gubinski, 09 CIV. 5645 FM, 2012 WL 279432, at *10 (S.D.N.Y. Jan. 30, 2012) ("As a matter of law, the Plaintiffs must submit objective medical findings based on a recent examination. . . . Accordingly, physicians' affidavits based solely on stale medical examinations are insufficient to defeat a motion for summary judgment."); Marziotto v. Striano, 38 A.D.3d 623, 624, 831 N.Y.S.2d 551, 552 (2d Dep't 2007) ("The respective affirmations, with annexed submissions, of the injured plaintiff's treating orthopedist and physician were insufficient to raise a triable issue of fact since the findings contained therein were not based on a recent examination of the injured plaintiff.").

In any event, even if the Court were to consider Dr. Gerard's affidavit, the Court would still find that the Plaintiff failed to demonstrate that he suffered "a permanent loss of use of a body organ, member, function or system" or "permanent consequential limitation of use of a body organ." Even though Dr. Gerard labeled the Plaintiff as "permanently partially disabled," the Plaintiff's own admissions at his deposition undermines Dr. Gerard's affidavit. Indeed, when asked what limitations he sustained as a result of his alleged injuries, the Plaintiff only stated that the accident 1) affected his ability to do things around the house; (2) made him "stay home more"; and (3) caused depression. (Schumacher Decl., Ex. 1 at 109:3–13.) He was unable to list any other activities that were limited by his alleged injuries from the January 6, 2010 accident. (Id.)

Furthermore, as previously stated, the Plaintiff admitted that he resumed his household activities a month or a few months after the accident, indicating that these limitations were temporary and not permanent. (Id. at 1110:16–25, 110:19–111:1–23, 114:25–115:2–9.) As such, the Plaintiff's deposition testimony proves that (1) he did not suffer a total, permanent loss of use as required by the "permanent loss of use of a body organ, member, function, system" category of N.Y. Ins. Law § 5102(d), Oberly, 96 N.Y.2d at 295, and (2) he did not suffer any form of permanency as required by the "permanent consequential limitation of use of a body organ or member" category of N.Y. Ins. Law § 5102(d), Dwyer, 480 N.Y.S.2d at 783.

Moreover, the Plaintiff failed to offer evidence in support of the 90/180 day category of N.Y. Ins. Law. § 5102(d). In this regard, the Plaintiff points to no evidence that taking out the garbage, mowing the lawn, and picking his son up from school constitute "sustainably all" of the his daily activities. Licari, 57 N.Y.2d at 236. Indeed, the Plaintiff admitted that the only activity among these that was daily was picking up his son from school. (Schumacher Decl., Ex.

1 at 113:14–115:4.)  It is the Court's view that this one activity did not "prevent [the Plaintiff] from performing his usual activities to a great extent," but rather only resulted in a "slight curtailment."  Licari, 57 N.Y.2d at 236.

The Court does acknowledge that the Plaintiff's evidence, if it was in admissible form, would be sufficient to raise a genuine issue of material fact as to whether the Plaintiff suffered a serious injury under the "significant limitation of use of a body function or system" category of section of N.Y. Ins. Law § 5102(d).  For example, the MRI confirmed by Dr. Gerard reveals bulging discs of the cervical spine.  (Falk Aff., Ex. 3.)  While generally such proof of a herniated disc is not sufficient to prove a "serious injury," Pommells, 4 N.Y.3d at 574, Dr. Gerard conducted range of motion tests that showed to an objective degree the limitations of use of the Plaintiff's injuries.  Courts have recognized that this kind of evidence can prove that a plaintiff's injuries constituted a "significant limitation of use."  See Alvarez, 2012 WL 4094828 at *5; Toure, 480 N.Y. S. 2d at 868; see also Zavialov, 2000 WL 133846 at *4; Amodeo v. Pitcher, 125 A.D.2d 850, 851, 509 N.Y.S.2d 957, 957 (3d Dep't 1986).

Dr. Gerard also stated that these objective tests showed that the Plaintiff will be limited in activities such as sitting, standing, walking, climbing stairs, and lifting heavy objects.  Cf. Hemmes v. Twedt, 180 A.D.2d 925, 926, 580 N.Y.S.2d 510, 511 (3d Dep't 1992) (upholding the defendant's motion for summary judgment in part because the physician made no mention of any activities which the plaintiff had been or would be unable to perform and offered no opinion as to the significance of the limitation).  Moreover, the examinations conducted by Dr. Gerard occurred over a long course of treatment from January 7, 2010 to March 18, 2011, which further supports finding that a triable fact exists.  See Lopez v. Senatore, 65 N.Y.2d 1017, 494 N.Y.S.2d 101, 484 N.E.2d 130 (1985); Plouffe v. Rogers, 144 A.D.2d 218, 219, 534 N.Y.S.2d 731, 733

(3d Dep't 1988). Accordingly, were the Court permitted to consider the Plaintiff's evidence, the Plaintiff would have arguably met his burden with respect to the "significant limitation of use of a body function or system" category of N.Y. Ins. Law § 5102(d).

Nevertheless, the Plaintiff is also required to rebut the Defendant's evidence with respect to causation with his own evidence. Thus, even if the Court did consider the Plaintiff's admissible evidence and determined that the Plaintiff had proven a serious injury as required by the No-Fault Law, the Court would still find that the Plaintiff has failed to proffer sufficient evidence to counter the Defendant's persuasive evidence concerning causation and pre-existing injuries. In this regard, the Plaintiff contends that his injuries are the result of the January 6, 2010 accident and that even if the medical records from his prior neck and low back injuries raise causation concerns, material issues of fact still exist as to whether the January 6, 2010 accident caused new injuries or aggravated prior asymptomatic injuries.

However, none of the evidence that the Plaintiff offers, including Dr. Gerard's affidavit, addresses whether the Plaintiff's pre-existing neck and low back injuries were resolved before the January 6, 2010 motor vehicle accident. Instructive here is the decision in <u>Franchetti v. Palmieri</u>, 307 A.D.2d 1056, 763 N.Y.S.2d 381 (3d Dep't 2003), <u>aff'd</u> 1 N.Y.3d 536, 775 N.Y.S.2d 232, 807 N.E.2d 282 (2003). In <u>Franchetti</u>, the plaintiff commenced a negligence action to recover for injuries sustained in an automobile accident. <u>Id.</u> at 382. Moving for summary judgment, the defendant argued that the plaintiff claimed he had sustained injuries that were in fact similar to injuries that the plaintiff had actually suffered prior to the subject accident. <u>Id.</u> In response, the plaintiff relied upon an affidavit from a chiropractor, who had begun treating the plaintiff immediately following the accident. <u>Id.</u> at 383.

Despite this, the Third Department upheld the lower court's decision to grant the defendant's motion for summary judgment on the ground that the chiropractor failed to address the plaintiff's pre-existing injuries. Specifically, although the chiropractor stated that the plaintiff's injuries were "separate and distinct from any pre-existing injuries that [she] may have had," the Third Department found this to be insufficient to defeat the defendant's motion for summary judgment, because the chiropractor "failed to explain his opinion that the preexisting conditions had resolved [itself]." Id.

On appeal, the New York Court of Appeals affirmed summary judgment in favor of the defendant. Franchini, 1 N.Y. 3d at 537. In reaching its holding, the Court of Appeals explained that the "[p]laintiff's submissions were insufficient to defeat summary judgment because her experts failed to adequately address [the] plaintiff's preexisting back condition and other medical problems, and did not provide any foundation or objective medical basis supporting the conclusions they reached." Id.; see also Carter, 815 N.Y.S. at 43 ("In order to recover damages for non-economic loss related to a personal injury allegedly sustained in a motor vehicle accident, a plaintiff is required to present competent, non-conclusory expert evidence sufficient to support a finding . . . that the injury was proximately caused by the accident at issue . . . . [I]n the absence of an explanation of the basis for concluding that the injury was caused by the subject accident, and not by other possible causes evidenced in the record, an expert's conclusion that plaintiff's condition is causally related to the subject accident is mere speculation insufficient to support a finding that such a causal link exists.") (citations and internal quotation marks omitted); Montgomery v. Pena, 19 A.D.3d 288, 289–90, 798 N.Y.S.2d 17, 18 (1st Dep't 2005) (granting the defendant's motion for summary judgment in part because the plaintiff's physician failed to mention the prior injuries or pre-existing conditions).

Similarly, in the instant case, while Dr. Gerard's affidavit states that the January 6, 2010 accident caused the Plaintiff's neck and lower back injuries, her affidavit, medical reports and October 6, 2010 letter do not adequately address the Plaintiff's pre-existing injuries.  As such, Dr. Gerard's affidavit is speculative and conclusory with regard to whether the Plaintiff's injuries were causally related to the January 6, 2010 accident.  See Franchini, 763 N.Y.S. at 381. Furthermore, to the extent that the Plaintiff is claiming that the January 6, 2010 accident aggravated asymptomatic pre-existing conditions, the Plaintiff is required to provide objective evidence that distinguishes aggravation of a pre-existing condition from the pre-existing condition itself.  Dabiere v. Yager, 297 A.D.2d 831, 832, 748 N.Y.S.2d 38, 29 (3d Dep't 2002) ("[I]n the absence of objective evidence establishing the aggravation as opposed to the underlying condition, plaintiffs' submission is insufficient to demonstrate serious injury under the permanent loss of use, consequential limitation of use or significant limitation of use categories.").  However, as already stated, the Plaintiff has provided no objective evidence addressing the Plaintiff's pre-existing injuries in any fashion.

Moreover, of note, the Plaintiff has also failed to explain his cessation from medical treatment.  In this regard, on March 18, 2011 the Plaintiff ended his physical therapy sessions with Dr. Gerard, but he offers no excuse in the record as to why he ceased medical treatment at that time.  Importantly, courts have recognized that "while a cessation of treatment is not dispositive . . . a plaintiff who terminates therapeutic measures following the accident, while claiming 'serious injury,' must offer some reasonable explanation for having done so." Pommells, 4 N.Y.3d at 574; Garces v. Yip, 16 A.D.3d 375, 376, 790 N.Y.S.2d 712, 714 (2d Dep't 2005); cf. Brown v. Dunlap, 797 N.Y.S.2d 380, 387 (2005) (finding that a gap in treatment was explained sufficiently when the physician stated that further medical therapy would "be only

palliative in nature").  Where, as here, a plaintiff fails to provide a reasonable excuse for the cessation of treatment for a substantial time, past courts have considered this when finding that the plaintiff has failed to raise a triable issue as to a serious injury.  See Bent v. Jackson, 15 A.D.3d 46, 48–49, 788 N.Y.S.2d 56, 59 (1st Dep't 2005); Melendez v. Feinberg, 306 A.D.2d 98, 99, 759 N.Y.S.2d 869, 869 (1st Dep't 2003); Vaughan v. Baez, 305 A.D.2d 101, 101, 758 N.Y.S.2d 648, 649 (1st Dep't 2003).

In sum, the Court finds that the Plaintiff has neither submitted admissible evidence in support of his claim that he suffered a serious injury, nor has he presented any viable evidence to explain in any manner the relationship of the pre-existing similar injuries.  Therefore, the Court grants summary judgment in favor of the Defendant with respect to the Plaintiff's claim for non-economic loss.

**E. As to the Plaintiff's Property Damage Claim**

The Plaintiff also seeks recovery for his alleged economic loss in connection with the January 6, 2010 automobile accident.  Under the provision of N.Y. Ins. Law. § 5102(a), the victim of an accident may recover their "basic economic loss" without regard to fault.  See Cooper v. U.S., 635 F. Supp. 1169, 1171 (S.D.N.Y. 1986).  "Basic economic loss" includes medical expenses, loss of earnings and other "reasonable and necessary expenses up to $50,000 per person."  N.Y. Ins. Law § 5102(a); Cooper, 635 F. Supp. at 1171.

In this case, the Plaintiff claims that his "basic economic loss" is the $1,000 property damage to his vehicle.  (Schumacher Decl., Ex. 1 at 99:15–18.)  However, under the FTCA, the Defendant cannot be held liable without a showing of fault.  Cooper, 635 F. Supp. at 1172.  In other words, the Plaintiff may recover his "basic economic loss" by bringing a common law negligence claim.  Id. at 1173.  In this regard, to prove negligence, the Plaintiff must show that

(1) the Defendant owed the Plaintiff a cognizable duty of care; (2) the Defendant breached that duty; and (3) the Plaintiff suffered damages as a proximate result of the breach. See Thomas v. County of Putnam, 262 F. Supp. 2d 241, 251 (S.D.N.Y. 2003); Solomon v. City of New York, 66 N.Y.2d 1026, 499 N.Y.S.2d 392, 489 N.E.2d 1294 (1985).

Having reviewed the summary judgment record and viewing the facts in the light most favorable to the Plaintiff as the non-moving party, the Court dismisses the Plaintiff's claim for property damage, as the Plaintiff has failed to show any damages. As the Defendant demonstrated in its summary judgment motion, there is insufficient evidence regarding this element of his negligence claim. Feis, 2010 WL 3818125, at *1 (quoting Jaramilo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008)). Indeed, the Plaintiff admitted that he did not pay any out-of-pocket expenses to repair his vehicle. (Schumacher Decl., Ex. 1 at 101:3–6.) The photographs provided by the Plaintiff show little or no damage to the naked eye. (Schumacher Decl., Ex. 1.C.) Furthermore, while the Plaintiff testified that he received an estimate for his automobile "somewhere in Freeport," and provided photographs of the alleged damages, (Schumacher Decl., Ex. 1 at 98:18– 99:24), he proffers no direct admissible evidence to support his property damage claim and, therefore, has failed to raise a triable issue of fact in this regard. Accordingly, the Court grants the defendant's motion for summary judgment dismissing the Plaintiff's property damages claim. Matsushita Elec. Indus. Co., 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).

## IV. CONCLUSION

For the foregoing reasons it is hereby:

**ORDERED**, that the Defendant's motion for summary judgment dismissing the Plaintiff's Complaint is granted in its entirety, and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
July 31, 2013

　　　　　*/s/ Arthur D. Spatt*　　　
　　　　　ARTHUR D. SPATT
　　　United States District Judge